[No. 2724.]

## ANDREW GRAVES *v.* THE STATE.

1. MURDER—PROOF OF THE GENERAL CHARACTER OF DECEASED.—It is never competent for the prosecution to show in the first instance against the defendant, that the person slain was of good or peaceable character. Such evidence, however, may be given in rebuttal, if the opposite has been testified to for the defense.

2. PRACTICE—EVIDENCE — CASE STATED.—The defense in a murder case having completed its testimony, the State proved by a witness the peaceable, harmless character of the deceased. The defense interposed no objection at the time, but, after it had gone to the jury, moved the court to exclude it, which the court refused to do, because it was not excepted to when offered. Thereupon the district attorney withdrew the question, and consented that the testimony be stricken out, and the court instructed the jury that said testimony was stricken out, and that it could not be considered by them; to which action of the court defendant excepted. *Held*, that while the court erred in refusing to exclude the

H

testimony upon motion of the defense, yet, in view of the evidence on this trial, and of the instructions of the court to the jury to disregard it, the error was not such as will warrant the reversal of the conviction.

3. SAME—EVIDENCE held sufficient to sustain a conviction for murder in the second degree.

APPEAL from the District Court of Colorado. Tried below before the Hon. Wells Thompson, Special Judge.

The indictment charged the appellant with the murder of Robert Wall, in Colorado county, Texas, on the third day of February, 1883. His trial resulted in his conviction of murder in the second degree, and the verdict awarded him a term of fifty years in the penitentiary.

Julia Wall, the widow of the deceased, was the first witness for the State. She testified, in substance, that she and her husband, the deceased, lived on Captain Donovant's place, in Colorado county, Texas, occupying a house of two rooms with a hall running between them. The doors of the two rooms faced each other across the hall. The witness, the deceased and their two children occupied one of these rooms as a sleeping apartment, and cotton was stored in the other. The defendant had been picking cotton for the deceased, and had been sleeping in the cotton room for two or three months prior to the third day of February, 1883, on which day the killing occurred. Some two or three weeks after the defendant was employed to pick cotton for the deceased, a woman named Margaret Fenner came to the house from Columbus, and was employed by the deceased to pick cotton. She also slept in the cotton room—the same room occupied by the defendant as his sleeping quarters. The witness could not say that the defendant and the woman Fenner slept together. She appeared to have known the defendant before she came to the house.

About a week before the shooting, the defendant quit picking cotton for the deceased, and hired for the same purpose on a neighboring farm. He picked cotton on that farm during the day and returned at night and slept in the cotton room at the house of the witness and her husband. The woman Fenner also left, and engaged in picking cotton on the same farm with the defendant, and she, too, would return at night and sleep in the cotton room.

On Friday night, February 2, 1883, which was the night before the killing, the deceased told the woman Fenner that she must

get out of his house next morning; that people were talking about her and the defendant, and that he, the deceased, did not like people living about his house of whom such talk was current; that he was going to Eagle Lake next morning, and wanted her to pack up and leave before he left, as the witness was going with him. Immediately after breakfast next morning, the woman Fenner went off and returned after a short time with the defendant and one Spooner. The deceased, who at that time was in the yard hitching his horses to his wagon, told the woman to hurry up and get her things out of his house. This seemed to make the woman angry, and she commenced saying very hard things about the witness and her husband. The deceased told her that she could talk as much as she pleased, but that she must hurry up and get out of the house, or he would take a stick to her. The defendant, who was then standing in the passage, spoke to the woman and told her to take her time about getting her clothes, and not to hurry; that Robert Wall might call her a liar, but could not call him one. Thereupon the deceased asked the defendant what he had to do with it, and told him that he, too, must get out of the house. At this time the defendant was standing in the door of the room occupied by the witness and the deceased; Margaret Fenner was inside the room, where she kept her clothes in a trunk the witness had loaned her. She could not possibly see anything that transpired out of the room. The witness was out in the yard, as was her husband, the deceased.

Calvin Thompson and another man in a wagon were at this time directly opposite the front of the house, in a road which ran along within ten feet of the house. The deceased, having made the remarks quoted, picked up a stick about as large as a chair round. The defendant left the door and started towards the deceased. The witness sprang to her husband, wrenched the stick from his hand and threw it away. She looked back at this moment and saw that the defendant had his pistol in his hand. Thereupon she jumped aside, the deceased turned away from the defendant, and the defendant fired, the ball taking effect a little behind the left side of the deceased. The defendant made an effort to shoot again, but the witness got between him and the deceased, and just at this time Calvin Thompson, who had got out of the wagon, came up and said to the defendant: "Don't fire any more; you have shot him once." The deceased had nothing in his hands at the time he was shot;

no weapons were about his person, nor was he making any demonstrations upon the defendant. Having shot the deceased, the defendant fled towards the bottom, leaving his hat. The daughter of the witness did not throw his hat into the fire. The deceased walked up to a house near by, and lay down, and afterwards was moved home. The woman Margaret Fenner could not see what was going on outside from where she was, inside the witness's room. The deceased was a right-handed man.

Doctor Bat Smith testified, for the State, that he was a regular practicing physician and surgeon, and had had a great deal of experience with gunshot wounds. He was called in to see the deceased on the evening of the day he was shot. He found that the ball had entered the body between the last rib and the point of the hip bone, ranging downward, backward and to the right, but making no exit. The wound was necessarily fatal, and the deceased died next day from its effects. From an examination of the entrance of the ball and the direction that it took, the party firing the shot must have been standing to the left side and a little behind the deceased. The witness did not see the clothes worn by the deceased when he was shot.

Calvin Thompson testified, for the State, that he and another man were going to Eagle Lake in a two-horse wagon on the morning of the killing, but had first to go to a gin for a load of cotton, and in going from the gin to Eagle Lake had to pass deceased's house, within ten steps. When they got opposite Wall's house, the witness heard the defendant say to Margaret Fenner that Wall might call her a liar, but that he could not call him one. At that time the defendant was standing in the passage door, the woman Fenner was inside the house, the deceased was in the yard hitching his horses, and his wife was standing near him, and near the house. Wall at this point released his horses and caught at a small seasoned stick, but his wife pushed him from it. The defendant stepped from the door and from the passage in the direction of Wall and his wife. He first ran his hand in his pocket and drew out a knife, but immediately replaced his knife and drew a five shooting pistol, and then stepped back a step or two and fired. Witness was in the act of jumping out of the wagon when the defendant fired. He saw that the defendant was trying to shoot again, and hurried between them in time to prevent another shot.

Wall at no time advanced towards the defendant, was making

no hostile demonstrations, and had no weapons about him. When the defendant fired Wall had turned and was walking away from the defendant. After shooting the deceased, the defendant turned and ran off towards the Colorado bottom, without his hat, which he knocked off his head himself as he waved the pistol over his head when he fired. The witness bears the defendant no ill will. He had never had a quarrel with his wife about the defendant, nor with the defendant about his wife. The parties were about ten feet apart when the fatal shot was fired. Two or three evenings before this trial the witness was at the jail, and hailed the defendant through the window, and asked him if he was going to plead guilty. He answered that he was not. The witness then told him not to depend on him, the witness; that he was going to tell the truth, and do all he could against him, the defendant. The sheriff and several others were present and heard what passed. The witness did this because he had heard that the defendant had said that he intended to plead guilty, because the witness saw him shoot Wall, and knew him to be guilty, and because he, witness, had been several days in attendance upon court, was hungry and without money, and wanted to get home. Here the State closed.

Margaret Fenner was the first witness called by the defense. She testified that she was a married woman, and lived in Columbus. Her husband was living. She lived with him last year, and this year up to the present time. In December of last year (1882) the witness was in very bad health, and is yet. Thinking she could be improved by traveling, she crammed a few clothes and a couple of quilts into a bag, and went to Eagle Lake on the train. From there she went to Wall's and engaged in picking cotton. She had previously formed the acquaintance of the defendant. She and the defendant picked cotton in the same field together, and slept in the same room, but in different beds. They occupied that room for about five weeks before the shooting. About a week before the shooting the defendant quit picking cotton for Wall, and went at the same work for a man who lived about a mile from Wall's. In a day or two the witness went to the same place, to pick cotton. She asked the deceased to allow her to sleep in the cotton house at night, as she had nowhere else to sleep, and he consented. Defendant slept in that same room.

On the night before the shooting, the witness, having a chill, slept in Wall's room. Wall told her that night that there was

bad talk going around the neighborhood about her and the defendant, and that he did not want her and the defendant to stay in the house any longer; that he and his wife were going to Eagle Lake next day, and that the witness and her things must get out of the house next morning before he started. Her "things" consisted of some wearing apparel she brought to the house in a bag and put in an old trunk of Julia Wall's in Wall's room, two quilts and some rations. The next morning the witness went to the house of a woman named Spooner, and asked if she could put her things in her house for awhile, and Spooner consented. While there, Wall came and spoke to her in a very loud and abrupt manner, and told her to get her things out of his house, as he wanted to go to Eagle Lake. Witness then asked Spooner to go with her and help bring her things. Spooner consented, and the two started. *En route* witness saw defendant going towards the gin and hailed him, and asked him to go and assist her. Defendant said that he did not have time, as he was going to Eagle Lake that morning. Witness told him that she was going in the same wagon, and repeated her request, when he consented, and went with her to the house.

Witness went into the house and pinned her things up in a shawl. Wall, who was in the yard hitching up his horses, spoke to the witness again in an abrupt, insulting tone, telling her to hurry up or he would take a stick to her. The defendant told the witness to take her time, and stepped from the door into the hall. The witness soon heard a noise, and went to the door to see what it was. She then saw that Wall had the defendant by the collar with his left hand, and with his right was striking him over the head with a green stick as large as the arm of the witness, which was a large arm. He struck the defendant three blows while the witness stood at the door, the last one felling him to his knees. Julia Wall, deceased's wife, was beating defendant with a stick at the same time. The defendant made no resistance whatever to this attack of Wall's. The witness stepped back into the room and resumed fixing up her clothes, "thinking it would be her time next." A few minutes after this the witness heard a pistol shot. She could not at this time see what was going on outside. Shortly after this Wall's little girl threw the defendant's hat into the fire.

The witness denied that she told John Brown, on the evening after Wall was killed, that just before the shooting the defend-

ant said to her: "Take your time in getting your things; Wall may call you a liar, but he had better not call me one, for I am h—ll when I get started." She denied that she told John Brown that Wall started to pick up a stick and that his wife Julia would not let him have it; or that Wall started off and the defendant drew his pistol, when she, the witness, stopped her ears, ran into the house and saw nothing of the shooting.

John Brown testified, for the defense, that he arrested the defendant on Sunday night after the Saturday of the shooting. He told the witness that Wall was beating him over the head with a heavy stick at the time the shot was fired, and asked the witness to examine his head for wounds. The witness looked closely, and could find neither bumps nor abrasions of the skin. He saw a small scratch on the defendant's forehead, which looked like it had been made by a brush.

The witness had a conversation with the woman Margaret Fenner on the evening of the day of the shooting. She told the witness that Wall was hurrying her up, and that the defendant, who was then standing in the door, told her to take her time, and told her that Wall called her a liar but could not call him one, as he was h—ll when he got started; that Wall at this time started to pick up a stick, and his wife would not let him, but pushed him off, when Wall turned from defendant; that the defendant then drew a pistol, and that she stopped her ears and ran into the house and did not see the shooting.

Jeff. Lewis testified, for the defense, that he was confined in the county jail of Colorado county, at the time that the defendant was brought there and incarcerated. The witness examined the defendant's head and hands at his request on the Monday after the shooting, and found three large knots on his head. The skin was not broken. The knuckles of both hands were blistered, but the skin was unbroken.

The motion for new trial set up generally that the court erred in the charge to the jury; that it erred in permitting the State to introduce evidence of the character of the deceased and then withdraw the same, thereby getting the benefit of illegal testimony; and that the verdict was contrary to the law and the evidence.

*George McCormick,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WILLSON, JUDGE.   Upon the trial of this case, after the testi-
mony for the defense was closed, the State proved by a witness
that the general character of the deceased was that of a quiet,
good natured man who would not harm anybody.  This evidence
was not objected to by the defendant at the time it was intro-
duced, but after it had gone to the jury the defendant moved to
exclude it, which motion the court overruled, because it had not
been objected to at the time it was offered.   Thereupon the dis-
trict attorney said that, in order to prevent any question about
the matter, he would withdraw the question and consent for the
testimony to be stricken out, and the court then instructed the
jury not to consider this evidence, and that it was stricken out.
This proceeding was excepted to at the time by defendant, and
is presented to us by a proper bill of exceptions, and earnestly
insisted upon by counsel as an error demanding the reversal of
the judgment.   That this testimony was not admissible when
objected to, there can be no doubt.   "It is never competent for
the prosecution to show, in the first instance against the defend-
ant, that the person slain was of good or peaceable character.
But such evidence may be given in rebuttal if the opposite has
been testified to for the defense."   (2 Bish. Cr. Proc., sec. 612.)
It was error in the court to refuse to exclude this testimony
from the jury when defendant moved to have it excluded, and,
under some circumstances, such error might be held sufficient
to work a reversal of the conviction.

But in this case, after a consideration of the evidence, which
to our minds overwhelmingly establishes the guilt of the de-
fendant, we cannot conceive how this illegal testimony could
possibly have affected him injuriously, especially when the court
explicitly informed the jury that it was stricken out, and directed
them to not consider it.   We think the error complained of,
while it is an error, is of such a trivial character as to be of no
appreciable consequence, and would not warrant a reversal of
the judgment.   (*Gose* v. *The State*, 6 Texas Ct. App., 121; *Rey-
nolds* v. *The State*, 8 Texas Ct. App., 412.)

There is no assignment of errors in the record, no other bills
of exception, and no other question made than the one we have
decided, and we find no error apparent of record which we feel
called upon to consider; and believing that the conviction is
fully supported by the evidence, the judgment is affirmed.

*Affirmed.*

Opinion delivered April 28, 1883.